

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,042

**FIDENCIO VALDEZ, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 20120D00749
### IN THE 384TH JUDICIAL DISTRICT COURT
### EL PASO COUNTY

RICHARDSON, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, YEARY, NEWELL, KEEL, and WALKER, JJ. joined. ALCALA, J. concurred in the result.

## O P I N I O N

On May 30, 2014, a jury convicted appellant of capital murder for intentionally causing the death of Julio Barrios in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 § 2(b) and (e), the trial

court sentenced appellant to death.[1]  Direct appeal to this Court is automatic.[2]  Appellant raises thirteen points of error.  After reviewing appellant's points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

In early December 2010, at a bus stop in El Paso, Gilbert Ramirez met a young man named Julio Barrios.  Ramirez saw Barrios pull out a bag of marijuana and asked Barrios if he knew anybody who sold marijuana.  Barrios responded that he sold marijuana and also other drugs, including ecstasy.  The two men exchanged phone numbers.  At the time, Ramirez was living with his sister-in-law, Ruby Jurado.  Both Ramirez and Jurado were acquainted with appellant.

Appellant had recently moved into his girlfriend Veronica Cera's apartment.  He did not have a job and he routinely drove Cera's car, a white Saturn SUV.  On December 10, 2010, appellant drove Cera's SUV to Jurado's house.  Cera was riding in the front passenger's seat.  Appellant, who was wearing gray sweatpants, a gray sweatshirt, and glasses, asked Jurado for Xanax pills and money for gas.  She gave him the pills, but told him that she did not have any money.  Appellant asked Ramirez if he knew where to get some "ecstasies."  Ramirez answered that he knew this "little boy" (meaning Barrios) who sold

---

[1] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(g).  Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

[2] TEX. CODE CRIM. PROC. art. 37.071 § 2(h).

ecstasy. Ramirez called Barrios on appellant's behalf and asked Barrios if appellant could buy forty ecstasy pills from him. Ramirez then passed the phone to appellant so that appellant and Barrios could work out the details concerning their transaction. Ramirez and Jurado overheard appellant discuss a price of $300 for thirty or forty ecstasy pills.

Cera and appellant then returned to Cera's apartment so she could prepare for her birthday party that evening. Cera testified that appellant spoke on the phone with "this kid" in order to "score some pills." The "kid" gave appellant directions to a location in northeast El Paso to make the exchange. Cera had $40 and she believed that she and appellant were going to "score" four pills for her birthday party with her money because appellant did not have any money. They left her apartment and stopped by appellant's friend Liz's house, where appellant had previously hidden a brown tote bag containing guns. Appellant went inside for five or ten minutes, and then they headed to the specified location.

Barrios and his girlfriend, Brenda Rosales, were shopping that day when he began receiving many phone calls. Barrios's uncle, Samuel Herrera, picked up Rosales and Barrios in Herrera's white Chrysler Sebring. At Barrios's request, Herrera drove the couple to the northeast part of town. Barrios continued to receive a lot of phone calls during the drive. Phone records admitted at trial revealed that Barrios received multiple calls from appellant's number during this time period. These calls ceased at 6:29 p.m. During the drive, Barrios kept insinuating to Herrera that he "was going to do something, like he was either going to score some weed or buy something." Barrios handed Herrera several empty sandwich bags

which led Herrera to surmise that Barrios intended to purchase some marijuana and divide it or do something else "drug related." Herrera followed Barrios's driving directions to a location on Waldorf Street.

Eventually, Herrera stopped his car near a white SUV parked on the opposite side of the street. Barrios got out of the Chrysler and approached the SUV. Cera heard appellant tell Barrios to get into the truck and saw Barrios climb into the back seat of her SUV (behind the driver's seat). Appellant then drove away and Herrera followed the SUV in his Chrysler. Appellant stopped in a darker area on Tropicana Street and Herrera parked about fifteen feet behind him. Appellant told Barrios to give him the pills. Barrios handed appellant a sandwich bag filled with pills. Appellant handed the bag to Cera and told her to count them. Cera started to count the pills—there were about thirty or forty of them—and then Barrios asked appellant for the money. Appellant told Barrios that "he ain't going to pay him shit." He asked Barrios if he was wearing a wire. Barrios got mad and told appellant to "give him his fucking pills back." Appellant responded that he was "not going to give [Barrios] shit." Cera then heard two shots and looked up to see that appellant had shot Barrios in the head.

Appellant got out of the SUV and pulled Barrios out of the vehicle. Cera panicked, threw the pills up in the air, got out of the SUV, and went around to the back of the vehicle. Appellant ordered Cera to "get back in the fucking truck" and she complied. From inside the SUV, Cera saw appellant shoot Barrios again while Barrios was on the ground. Appellant then turned and shot twice at the car (the Chrysler) parked behind them. Cera also testified

that she saw a man and a girl get out of the car and they were yelling.

From their vantage point in the Chrysler, Herrera and Rosales heard a bang from within the SUV. Herrera thought he saw a flash from the passenger's side of the SUV, but his attention was focused on the driver's side. The driver of the SUV, whom Herrera described as tall and thin, and wearing glasses and a gray hooded sweatshirt, exited the SUV and opened the rear driver's side door. Herrera saw the driver pull Barrios out of the SUV and shoot him while he was on the ground. Meanwhile, Herrera got out of his Chrysler and started to run toward the SUV. The driver turned and pointed the gun at Herrera. He began shooting in Herrera's direction and shot the windshield of the Chrysler. Herrera ducked behind his car door. He heard a total of about five shots, and then the driver drove away in the SUV. Herrera grabbed a crowbar from his vehicle and ran after the SUV, but it was already gone. He picked Barrios up and saw the gunshot wounds to his head. Barrios's eye was protruding from its socket and he was bleeding from his mouth and nose. Rosales ran to Barrios and grabbed his hand. Some people approached them and Herrera asked them to call 911.

Forest Zozaya, who was visiting a friend on Tropicana Street on December 10, 2010, witnessed these events. He told the police that he had seen an SUV and a car drive up and park on Tropicana Street. He said that he heard the muffled sound of gunshots coming from inside the SUV. Zozaya saw the driver of the SUV exit the vehicle, open the driver's side back door, and "pull out a guy and drop him on the floor." Zozaya heard three more shots

and he assumed that the driver had shot the guy on the ground. Zozaya heard a girl repeatedly screaming "Julio" and "No" and heard someone yell, "call 911." Zozaya described the SUV's driver as tall and thin and wearing a gray "hoodie" sweatshirt and glasses.

At approximately 6:30 p.m., appellant called Ramirez and made a statement in Spanish that equated to, "everything got ruined" or "everything had gone down wrong." At this point, appellant's cell phone was transmitting its signal via a cell tower that was located only about three-tenths of a mile from where Barrios was shot. Ramirez asked appellant what he meant and what had happened, but appellant would not tell him anything. Appellant instructed Ramirez not to say anything to Jurado, and he hung up the phone. However, Ramirez told Jurado what appellant said. Ramirez and Jurado then began trying to call appellant, but he did not answer his phone. Eventually Jurado reached appellant and asked him, "[W]hat happened to the little boy?" Appellant told her, "No, nothing. Don't worry about it." He acted "all pissed off" and hung up on her. After that conversation, Jurado never spoke with appellant again. Ramirez and Jurado viewed phone records in court and identified various calls between appellant and Barrios.

Cera testified that, as appellant drove away after shooting Barrios, he yelled at her for getting out of the SUV. He stopped at a stop sign and asked her if she was "down to go with him" or if she was "going to stay." Cera interpreted this question as a threat, and she told him that she would stay. They drove back to his friend Liz's house and then went to Cera's

sister's house. Later, appellant took Cera's SUV for a few days and then abandoned it on a road. He called Cera's home and left a message telling her where to find the SUV. When Cera picked up the SUV, she discovered blood spatter, appellant's black shirt and glove, and Barrios's shoe in the vehicle. She cleaned up the blood with Clorox, burned the shoe and the clothing, and hid the SUV near her sister's house.

Hours after the shooting, appellant arrived at his ex-wife's house in the middle of the night with his car radio blaring. He told her that something bad had happened. He was very "hyper" and he asked her for cocaine and twenty dollars. She testified that he was a drug addict who asked her for money and stole to support his habit. About six days after the shooting, El Paso police officers asked Herrera to look at a photo line up. Herrera identified appellant in the third photo in the second group as the driver of the white SUV. Herrera said he recognized appellant's eyes, glasses, and the slim shape of his face. He said the photo lineup identification process took, at most, about five minutes. Herrera also identified appellant in the courtroom as the driver of the white SUV and the man who shot his nephew.

Detective Ray Sanchez was assigned to investigate this case. He testified that he used phone records and other information to find Cera. Cera eventually led Sanchez to the place where her white SUV was hidden and she made a statement about what had happened on December 10th. Subsequent forensic testing revealed blood inside Cera's SUV and in its tire well that yielded DNA profiles consistent with Barrios's DNA. Cera testified that appellant returned to her apartment after Sanchez had come. In Cera's presence, appellant instructed

his friend, Santiago De Leon, to "get rid of the gun."

Detective Sanchez also obtained video footage taken on December 6, 2010, by a camera located at the Bayou Bar and Grill. The video showed appellant making a cell phone call in the bar. Cell phone records demonstrated that he was then using the same phone number that called Barrios repeatedly on December 10th.

The medical examiner testified that Barrios died as a result of two gun shot wounds to his head. Both wounds exhibited stippling, which indicated that the assailant fired the gun in close proximity to the victim.

## USE OF FALSE EVIDENCE

In his first point of error, appellant argues that the prosecutors deprived him of due process of law in violation of the Fourteenth Amendment to the United States Constitution by knowingly using Cera's false out-of-court statements and allegedly false trial testimony as substantive evidence. Appellant further contends in his second point of error that the prosecutors deprived him of due process of law by allowing Cera's false statements to "go uncorrected."[3]

The State's "constitutional duty to correct known false evidence is well established both in law and in the professional regulations which govern prosecutorial conduct. . . . It does not matter whether the prosecutor actually knows that the evidence is false; it is enough

---

[3] *See Napue v. Illinois*, 360 U.S. 264, 269–71 (1959) (holding that a prosecutor violated the defendant's due process rights under the Fourteenth Amendment when he failed to correct a witness's false statement that the witness had been promised no consideration in return for his testimony).

that he or she should have recognized the misleading nature of the evidence."[4]   Further, it matters not whether the falsity concerns the accused's guilt or the witness's credibility:  "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."[5]  The State violates a defendant's right to due process when it actively or passively uses perjured testimony to obtain a conviction.[6]

Further, testimony need not amount to perjury to constitute a due process violation–the proper question "is whether the particular testimony, taken as a whole, 'gives the jury a false impression.'"[7]  "If the prosecution presents a false picture of the facts by failing to correct its own testimony when it becomes apparent that the testimony was false, then the conviction must be reversed."[8]  However, the defendant bears the burden of showing that the testimony used by the State was false.[9]  Discrepancies in testimony alone do not establish falsity.[10]

The knowing use of false testimony violates due process only when a "reasonable likelihood" exists that the false testimony affected the outcome, i.e., the false testimony was

---

[4] *Duggan v. State*, 778 S.W.2d 465, 468–69 (Tex. Crim. App. 1989).

[5] *Napue*, 360 U.S. at 269–70 (internal citations omitted).

[6] *Ex parte Castellano*, 863 S.W.2d 476, 481, 485–86 (Tex. Crim. App. 1993).

[7] *Ex parte Weinstein*, 421 S.W.3d 656, 665–66 (Tex. Crim. App. 2014).

[8] *Losada v. State*, 721 S.W.2d 305, 311 (Tex. Crim. App. 1986) (citing *Napue*, 360 U.S. 264).

[9] *Id*.

[10] *Id*. at 312.

material.[11] This "'reasonable likelihood' standard is equivalent to the standard for constitutional error, which 'requir[es] the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"[12]

*Cera's 2010 and 2012 Statements*

Appellant specifically complains about the State's use of Cera's December 17, 2010 videotaped statement to Detective David Samaniego and her August 19, 2012 written supplemental statement to other officers. Appellant argues that prosecutors knew these exhibits contained falsehoods, but they "failed to correct any of the false statements and lies at any point in the trial." Appellant enumerates the following alleged falsehoods in Cera's 2010 and 2012 statements:

> • Appellant claims that, in Cera's 2010 and 2012 statements, she asserted that appellant did not shoot Barrios until after he got out of the SUV and opened the back door of the vehicle. Yet at trial Cera testified that appellant shot Barrios first from the driver's seat.
>
> • Appellant contends that, in Cera's 2010 statement, when asked whether she ever saw the gun "afterwards," she answered that she did not see the gun and then shook her head in response when the detective asked her, "Never?" In her trial testimony, Cera stated that she first saw the gun when appellant shot "the little kid."
>
> • Appellant asserts that, in Cera's 2010 statement, she said that she heard appellant fire two shots and then she "blacked out." She said she could not remember what

---

[11] *Weinstein*, 421 S.W.3d at 665; *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

[12] *Ghahremani*, 332 S.W.3d at 478 (internal citations omitted).

happened after that. In her 2012 statement, she said that she saw Barrios leaning against the back seat and saw appellant pull him out of the SUV, and she did not mention blacking out. In her trial testimony, she stated that she "blacked out," but she recounted hearing a total of five gunshots, including two shots that she saw appellant fire at Barrios from inside the car.

• Appellant complains that Cera testified at trial that she only took about four steps towards the back of the SUV before she re-entered the vehicle. But in 2012, Cera stated that she went around the back of the vehicle from the passenger side before re-entering the SUV.

• Appellant claims that, in Cera's 2012 statement, she reported that appellant told her to get out of the car, but in her trial testimony, she did not mention that appellant told her to get out of the car.

Appellant contends that, as Cera was the "only witness who could testify regarding what brought about the shooting incident[,]" Cera's testimony was material to the outcome of the case. He asserts that the prosecutors "were knowingly complicit in presenting false evidence[,]" which so "tainted and corrupted the 'truth seeking function' of the trial that the only remedy . . . would be to grant [appellant] a new trial."

The State argues that appellant failed to preserve his due process claims for review because he did not object in the trial court on this basis, nor did he raise these claims in a motion for new trial.[13] Appellant responds in his reply brief that no objection was necessary because the State's presentation of Cera's false statements and failure to correct them

---

[13] *See* Tex. R. App. P. 33.1(a) ("As a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion . . . ."); *Pena v. State*, 353 S.W.3d 797, 807-09 (Tex. Crim. App. 2011) ("A complaint is timely if it is made 'as soon as the ground of objection becomes apparent.' Regarding its specificity, the objection must simply be clear enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error." (internal citations omitted)).

deprived him of due process, and thus represented a violation of an "absolute systemic requirement" and fundamental error.[14]

To preserve error for appellate review, an appellant is ordinarily required to make a timely request, objection, or motion to the trial court stating the grounds for the ruling sought with sufficient specificity to make the trial court aware of his complaint.[15] Additionally, an appellant's point of error on appeal must comport with the objection made at trial.[16] In *Marin v. State*,[17] we held that the requirement that a party raise a timely and specific objection does not apply to two types of errors: violations of "rights which are waivable only" and denials of "absolute systemic requirements."[18] Rights that are waivable-only include the right to the assistance of counsel and the right to trial by jury. Absolute systemic requirements include fundamental errors such as jurisdiction over the person, jurisdiction over the subject matter,

---

[14] *See* TEX. R. EVID. 103(d) (2014) ("In a criminal case, nothing in these rules precludes taking notice of fundamental errors affecting substantial rights although they were not brought to the attention of the court."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) (stating that, "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that false testimony could have affected" the jury's judgment).

[15] *See* TEX. R. APP. P. 33.1(a)(1).

[16] *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014).

[17] *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993).

[18] *Saldano v. State*, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002) (citing *Marin v. State*, 851 S.W.2d 275, 280 (Tex. Crim. App. 1993)).

and compliance with the Separation of Powers Section of the Texas Constitution.[19]

We have generally held that the failure to object in a timely and specific manner to the admission of evidence during the trial forfeits complaints about the admissibility of that evidence, even when its admission violates a constitutional right.[20] For example, despite the State's confession of error in *Saldano*, we held that Saldano's claim–that the State's testimony improperly appealed to jurors' racial prejudices in violation of the Equal Protection Clause–implicated neither an "absolute, systemic requirement nor a right that is waivable only."[21] We concluded that Saldano's failure to object to the testimony precluded his raising the claim on appeal.[22]

Subsequently, this Court considered the applicability of our holding in *Saldano* to the question of whether a defendant waived error by failing to raise a timely objection when the State presented incorrect testimony about the prison classification system at the punishment phase of his trial.[23] The Court observed that Estrada "could not reasonably be expected to have known that [the witness's] testimony was false at the time that it was made."[24] We

---

[19] *Id*. at 887–88.

[20] *Id*. at 889.

[21] *Id*.

[22] *Id*.

[23] *Estrada v. State*, 313 S.W.3d 274, 286–88 (Tex. Crim. App. 2010).

[24] *Id*. at 288.

noted that the State, which had stipulated to the error, has a "duty to correct 'false' testimony whenever it comes to the State's attention."[25] We concluded under these circumstances that Estrada had "no duty" to object at trial to the false testimony.[26]

The instant case differs from *Estrada* in significant respects. Unlike Estrada's counsel, appellant's trial counsel was aware of the contradictory facts contained in Cera's 2010 and 2012 statements to police before the State offered these exhibits into evidence. In fact, defense counsel cross-examined Cera at length about the discrepancies between her earlier statements and her trial testimony. Counsel elicited Cera's testimony showing that, in 2010, she told Detective Samaniego facts that were different from the facts she related in her trial testimony. For example, counsel elicited Cera's testimony that she told Detective Samaniego that, after Barrios handed over the ecstasy pills, appellant and Barrios argued about whether Barrios was wearing a wire, which she had not mentioned in her direct examination testimony. Also, counsel elicited Cera's admission that she told police that she heard only two shots and then she "blacked out."

Further, Cera testified on cross-examination that, in her 2010 and 2012 interviews, she omitted facts and made statements that were not true. For example, Cera admitted that she did not tell Detective Samaniego anything about counting the pills and she did not mention throwing the pills into the air. Cera also admitted giving police incorrect information about

---

[25] *Id*.

[26] *Id*.

whether the gun shots came from inside the car, what she did after returning home on the night of the shooting, and when she last spoke to appellant.

After defense counsel exposed the inconsistent statements contained in Cera's 2010 and 2012 statements, the State proffered the complained-of statements on redirect examination. When the State sought to admit the statements, the trial judge specifically asked defense counsel if they had any objection to the exhibits. To the trial judge's apparent surprise, counsel only requested that the statements be redacted, rather than excluded from evidence:

> THE COURT: Do you have an objection?
> [Defense Counsel]: Yes, we do.
> THE COURT: What's the objection? . . .
> [Defense Counsel]: With regards to the interview, I would like to ask if we could redact anything that has reference to any other crimes, which I think she does talk about --
>
> [Prosecutor]: I'll double-check.
> THE COURT: You guys have no objections to this coming in other than that?
>
> [Defense Counsel]: Other than that.
> THE COURT: You like what's in there?
> [Defense Counsel]: Yes, sir. Other than --
> THE COURT: It's all hearsay. That's all hearsay, but you're going to let it in?
>
> [Defense Counsel]: Yeah.
> THE COURT: Man, very interesting to me. Okay. They're admitted with that caveat.

Thus, other than requesting the redaction of references to other crimes, defense counsel expressed no objection to the admission of Cera's 2010 and 2012 statements and indicated

that the defense "like[d] what's in there."[27]

In sum, the record shows that appellant's counsel fully understood that the complained-of exhibits contained Cera's inconsistent statements, had already revealed many of those statements to the jury, and affirmatively indicated to the trial court that the defense did not object to the State's submission of the exhibits on these grounds. On these facts, we hold that the admission of Cera's 2010 and 2012 statements did not abrogate an absolute systemic requirement or a waivable-only right. Appellant had a duty to raise a timely and specific objection to these exhibits and he did not do so. Therefore, he did not preserve his claim of a due process violation in the State's submission of–or failure to correct false and inconsistent statements within–these exhibits.[28]

Even if appellant had preserved this issue, his claim still fails. After introducing Cera's 2010 and 2012 statements, the prosecutor referred to defense counsel's cross-examination and elicited Cera's testimony that she had made inconsistent statements, omitted facts, and did not give the "full truth" to police in 2010. In response to the prosecutor's questions, Cera testified that at the time of the offense she was using drugs, her friends were not good people, and she was not a "big fan" of law enforcement. Cera testified that,

---

[27] Appellant does not argue that the State failed to redact references to other crimes, and the record shows that the prosecutor agreed to "double-check" for any such references.

[28] *Cf. Saldano*, 70 S.W.3d at 888–90; *see also Darcy v. State*, 488 S.W.3d 325, 330 n.19 (Tex. Crim. App. 2016) (noting that a defendant's due process claim concerning the admissibility of a note written by a witness was the type of claim that is forfeited by inaction); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (concluding that the failure to object at trial waived a federal constitutional due-process claim).

because she was scared, did not want to be seen as a snitch, and was trying to trying to protect her sister, she omitted facts when she spoke to Detective Samaniego. For example, she did not tell Samaniego that she burned appellant's clothing and that she overheard appellant's conversation about getting rid of the gun. The State elicited Cera's testimony that, after these events, her husband was killed and her life changed. She stated that she no longer uses drugs and now cooperates with law enforcement.

Through its redirect examination of Cera, the State complied with its "constitutional duty to correct known false evidence" in Cera's 2010 statement.[29] In addition, though the record shows that Cera's earlier, contradictory statements to police contained false information, Cera was consistent from 2010 through her trial testimony about certain key facts: appellant was driving her SUV; Ramirez put appellant in contact with a young man who had ecstasy pills; she and appellant met the young man on the northeast side; the young man got into the SUV behind the driver's seat and handed over a bag of pills; appellant refused to pay him for the pills and told him to get out of the car; the two men argued; and then appellant shot the young man. The inconsistencies between Cera's 2010 and 2012 statements and her testimony at trial–though relevant to the jury in its assessment of her

---

[29] *Duggan*, 778 S.W.2d at 468–69 ("The prosecutor's constitutional duty to correct known false evidence is well established . . . ."); *see also Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002) (noting that, even if the witness's testimony "was a lie, the State corrected the false testimony in its closing argument"); *see, e.g., Marchbanks v. State*, 341 S.W.3d 559, 563 (Tex. App.—Fort Worth 2011, no pet.) (holding that, even assuming a witness's testimony that he did not punch the defendant was perjured, the State corrected the witness's misstatement by informing defense counsel about a recorded admission and recalling the witness to address the misstatement).

credibility–do not demonstrate that her trial testimony was false.[30]

*Cera's Trial Testimony*

Appellant additionally argues that Cera's trial testimony contained internal inconsistencies which gave the jury a false impression and which the State did not correct. He asserts that, "Cera's testimony that [appellant] had difficulty removing Julio Barrios from the back seat of the SUV because Barrios continued to hold onto the headrest of the driver's seat with his hand after Valdez had already shot him in the head at point blank range with a firearm is an obvious falsehood."[31] And he complains that Cera's trial testimony was internally contradictory because Cera testified that, when appellant shot Barrios on the ground, she was outside the car. However, elsewhere she indicated that she was back inside the car when appellant shot Barrios on the ground. Appellant also contends that Cera did not provide consistent testimony about precisely when she first saw appellant with the gun. Moreover, she testified that she "blacked out" for a short time after she heard the shots, and yet she testified to the events that happened after appellant shot Barrios with no apparent breaks in chronology.

Appellant further asserts that "[i]f Herrera's [the driver of the Chrysler who followed

---

[30] *See Losada*, 721 S.W.2d at 312 (finding there was nothing in the record showing that a witness's trial testimony was false where the witness had given an earlier contradictory statement to authorities but at trial "admitted that when he turned himself in he was scared and wanted to tell the story in the best light in order to protect himself").

[31] Appellant does not provide a record citation or other authority to support his assertion that Cera's impression that Barrios's arm was gripping the car seat after he was shot was an "obvious falsehood."

Appellant] trial testimony is believed, his description of the person who first shot Julio

Barrios from inside of her SUV is evidence that Veronica Cera was the shooter."[32] Appellant

posits that "[c]ommon sense dictates that a woman with a loaded gun is as equally capable

of killing another person as is a man with a loaded gun." Appellant complains that the State

did not reveal in its questioning of Cera that she could have been charged with "capital

murder, robbery, tampering with evidence, and other crimes" for her conduct and thus had

a strong motive to assist the State. He argues that, by portraying Cera as a victim and a

reformed, more law-abiding person, "the State created a false impression of Cera as a

credible person before the jury." Ultimately, appellant's arguments that Cera's trial

testimony was false, contradictory, and created a false impression are based entirely on

evidence presented at trial. Appellant's counsel cross-examined Cera regarding matters

affecting her credibility and objected to her testimony on unrelated grounds, and yet at no

point did he object to her testimony on the due process grounds he now raises on appeal. To

the extent that Cera made inconsistent, implausible, or conflicting statements in her

testimony, appellant could "reasonably be expected to have known" that her testimony "was

---

[32] Herrera testified that he had previously given a statement declaring that it appeared that the passenger had gotten out of the SUV and shot at him [Herrera] twice. At trial, Herrera testified that he heard a total of about five shots. First, Herrera heard a "loud bang" and saw a "flash" from inside the SUV. He got out of his car and he "was running towards [his] nephew when the driver pulls out [Barrios] and shoots him again." Herrera also testified that he saw a "shadow" and a "flash" that appeared to come "from the passenger side" but his attention was focused on the driver's side. He heard a fourth shot from the driver's side and he also heard a fifth bang, which could have been an echo.

false at the time that it was made."[33]  Thus, we again conclude that appellant had a duty to raise a timely and specific objection on due process grounds and he did not do so.  Therefore, he did not preserve this claim.[34]

Even if appellant had preserved this claim, it lacks merit.  We have previously held that minor inconsistencies in a witness's trial testimony do not, without more, show that the witness's testimony is false.[35]  Contradictory witness testimony during trial "merely establishes a credibility question for the jury" to decide and it "does not suffice to demonstrate" that the evidence gave the jury a false impression.[36]  The jury is the sole judge of a witness's credibility and the weight of his testimony, especially where the record contains conflicting testimony.[37]

---

[33] *Cf. Estrada*, 313 S.W.3d at 288; *see also Saldano*, 70 S.W.3d at 889.  Herrera testified the day before Cera testified.

[34] TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1); *see also Hill v. State*, 633 S.W.2d 520, 524–25 (Tex. Crim. App. 1981) ("The State has a valid interest in requiring an objection and precluding the defendant from later complaining if no contemporaneous objection was lodged."); *Wainright v. Sykes*, 433 U.S. 72, 88–89 (1977) (detailing the many reasons justifying the contemporaneous objection rule).

[35] *See Ex parte De La Cruz*, 466 S.W.3d 855, 871 (Tex. Crim. App. 2015) (finding that inconsistencies in a eyewitness's trial testimony compared with an expert witness's opinion, with respect to the number of times the victim was shot and the location of the shooting, did not, without more, support a finding that the witness's testimony was false) (citing *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) (stating that the fact that a witness may have given an earlier inconsistent statement, or that other witnesses may have a conflicting recollection of events, does not establish that the witness's testimony was false)).

[36] *Id*. (quoting *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990)).

[37] *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) (holding in a case involving contradictory testimonial evidence that it was "for the jury to determine" whether two witnesses were "lying or telling the truth"); *see also* TEX CODE CRIM. PROC art. 38.04 ("The jury, in all cases, is the exclusive judge of the facts proved and of the weight to be given to the testimony, . . . .").

Appellant points to no evidence showing that any witness ever stated that he saw Cera shoot Barrios. However, the jurors did hear testimony that Herrera saw a "shadow" and a "flash" that appeared to come "from the passenger side" of the vehicle and that Herrera had given an earlier statement asserting that the SUV passenger had shot at him twice. The jury also heard testimony that Cera hid her SUV behind a sister's house, cleaned Barrios's blood from her SUV, burned appellant's clothing and Barrios's shoe, and lied to Detective Samaniego. The jurors had the opportunity to observe Cera's demeanor and were capable of weighing the credibility of her testimony against the contrary evidence. We will not second-guess their assessment of her credibility.

*Materiality*

Even if we assume that Cera's statements and trial testimony collectively gave the jury a false impression, appellant is not entitled to relief. The false impression, if any, conveyed by Cera was not "material" because defense counsel effectively cross-examined her about the inconsistencies in her statements, and because the State corrected the false impression by eliciting testimony through redirect examination showing that Cera had made false and inconsistent statements.[38] Further, apart from Cera's testimony, the record contained overwhelming evidence showing appellant's identity as the perpetrator and his intent to commit capital murder. This evidence included: (1) testimony from Jurado and Ramirez that

---

[38] *See Vasquez*, 67 S.W.3d at 239; *see also Ramirez v. State*, 802 S.W.2d 674 676 (Tex. Crim. App. 1990) ("When a witness leaves a false impression concerning a matter relating to his or her credibility, the opposing party is allowed to correct that false impression.").

appellant negotiated the drug transaction with Barrios; (2) Herrera's positive identification of appellant from a pretrial lineup as the driver of the SUV and the shooter of Barrios; (3) other witness testimony identifying appellant as the driver of the white SUV in which Barrios's blood was found; (4) the fact that appellant fled the scene of the crime and failed to call 911; (5) appellant's phone records, cell site location information, and messages which linked him to Barrios's murder; and (6) appellant's incriminating statements and behavior after the shooting.

In sum, the record does not demonstrate a reasonable likelihood that any false content in Cera's 2010 and 2012 statements or discrepancies in her trial testimony affected the outcome of the trial.[39]  Accordingly, we overrule points of error one and two.

## FAILURE TO DISCLOSE EVIDENCE

In appellant's third point of error, he argues that the State violated *Brady v. Maryland*[40] by failing to disclose to the defense Cera's prior inconsistent statements made to prosecutors during pretrial meetings.  He complains that prosecutors did not provide him with "a written summary of how Cera's story had changed" or "a new statement from Cera showing how her trial testimony would be substantially different from statements she had made" to police.  Specifically, appellant complains that the State never informed him "before trial" that "Cera would be testifying that she first observed [appellant] pull a gun and point

---

[39] *See Ghahremani*, 332 S.W.3d at 478 ("The knowing use of false testimony violates due process when there is a 'reasonable likelihood' that the false testimony affected the outcome.").

[40] *Brady v. Maryland*, 373 U.S. 83 (1963).

it at Barrios while inside the Saturn Vue and that she observed [appellant] shoot Barrios in the head while still inside the SUV, even though [Cera] had never told this story before." Appellant argues that the State's questioning of Cera on redirect "belied a conscious decision on the part of the prosecutors to abandon Cera's two prior accounts of the shooting" in favor of "a new, revised version of events." He asserts that defense counsel "were caught entirely by surprise" by the change in Cera's story, and cites defense counsel's cross-examination of Cera as proof of this surprise.

Appellant argues that, by introducing Cera's 2010 and 2012 statements as substantive evidence, the State "assumed the obligation to identify all inconsistent oral statements Cera had previously made" because Cera's oral pretrial statements thereby became impeachment evidence.[41] He argues that this impeachment evidence was material because Cera was the only alleged eyewitness to the gun shots that occurred inside the SUV and to the events leading up to them.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment," regardless of the good or bad faith of the prosecutor.[42] Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.[43] In

---

[41] *See* TEX. R. EVID. 613.

[42] *Brady*, 373 U.S. at 87.

[43] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

order for a defendant to succeed with a *Brady* claim against the State, he must satisfy three requirements: "(1) the State suppressed evidence, (2) the suppressed evidence is favorable to him, and (3) the suppressed evidence is material."[44] *Brady* and its progeny do not require prosecutors to disclose exculpatory information that the State does not have in its possession and that is not known to exist.[45]

When evidence allegedly withheld in violation of *Brady* is disclosed during trial, we inquire whether the defendant was prejudiced by the tardy disclosure.[46] To demonstrate prejudice, a defendant must show a reasonable probability that, if the evidence had been disclosed to the defense earlier, the result of the proceeding would have been different.[47] "If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been."[48] A defendant's failure to request a continuance when *Brady* evidence is disclosed at trial arguably waives his complaint that the State has violated *Brady* and suggests that the

---

[44] *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) ("Incorporated into the third prong, materiality, is a requirement that defendant must be prejudiced by the state's failure to disclose the favorable evidence." (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)).

[45] *Pena*, 353 S.W.3d at 810 (citing *Hafdahl v. State*, 805 S.W.2d 396, 399 n.3 (Tex. Crim. App. 1990)).

[46] *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *see also United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998) ("Because the government produced the allegedly inconsistent statement during the trial, the evidence was not suppressed. . . . Under these circumstances, the court looks to whether [the defendant] was prejudiced by the tardy disclosure.").

[47] *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999).

[48] *Little*, 991 S.W.2d at 866.

tardy disclosure of the evidence was not prejudicial to him.[49]

The State argues that appellant failed to preserve his *Brady* complaint for review because he failed to make a specific objection and obtain an adverse ruling on that objection.[50]  To be timely, where *Brady* evidence is discovered or disclosed at trial, the defendant must raise an objection as soon as the grounds for the complaint become apparent.[51]  The record reflects that appellant's counsel did not object on the basis of *Brady* or request a continuance at any point during Cera's testimony.  And the record is silent regarding what was or was not disclosed to counsel prior to trial.  On this record, appellant has not preserved his claim of *Brady* error.

Further, even if we were to assume that appellant preserved error and that the State failed to notify him of Cera's changed story in a timely manner, his claim would fail. Appellant undermines his own argument that his counsel were "caught entirely by surprise"[52] when he states that, in their cross-examination of Cera, "Defense Counsel, point by point, demonstrated to the jury just how radically Cera's story of how the shooting [sic] had changed, and how she had also altered numerous important details relating to events both

---

[49] *See State v. Fury*, 186 S.W.3d 67, 73–74 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see also Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. 1982) ("The failure to request a postponement or seek a continuance waives any error urged in an appeal on the basis of surprise.").

[50] *See* TEX. R. APP. P. 33.1(a); *see also Pena*, 353 S.W.3d at 806–07; *Wilson*, 7 S.W.3d at 146 (applying the Rule 33.1 error preservation requirements to a *Brady* claim).

[51] *See Wilson*, 7 S.W.3d at 146.

[52] Trial Tr. at 137–67.

preceding and following the shooting." In fact, defense counsel responded to Cera's testimony by thoroughly cross-examining her and exposing various inconsistencies between her trial testimony and her earlier statements.[53]

Appellant counters that counsel "would have been able to prove up many more of Cera's lies before the jury if he had been afforded timely disclosure" of her "new story." In support, he merely refers us to his list of inconsistencies between Cera's earlier, out-of-court statements to police and her trial testimony in his first and second points of error, summarized *supra*. But appellant has not shown that, given more time, he could have exposed any significant inconsistent statements of a different ilk than the ones counsel had already exposed. Nor has he demonstrated that he could have proven that Cera actually lied in her trial testimony, as opposed to her out-of-court statements, which she openly admitted contained inconsistencies. Also, had counsel believed that they needed more time to prepare to cross-examine Cera, they could have objected and requested a continuance. Instead, after the State completed its redirect examination, defense counsel declined to ask any more questions of Cera. Defense counsel later returned to the subject of Cera's credibility in closing arguments, emphasizing that Cera had given three different stories and asserting that even the prosecutor had conceded that she was a liar.

In sum, appellant has not demonstrated that he was prejudiced by the allegedly tardy

---

[53] *See, e.g., Marshall v. State*, 210 S.W.3d 618, 636 (Tex. Crim. App. 2006) (holding that, where the State allegedly failed to disclose the statement of an inmate that appellant did not really assault him, but the defense called the inmate to testify to that effect, any *Brady* violation was harmless).

disclosure of Cera's changed story. We overrule his third point of error.

## SUFFICIENCY OF THE EVIDENCE

In point of error four, appellant contends that the evidence is legally insufficient to support his conviction for capital murder and only supports a conviction for murder. When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[54] This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[55]

Appellant was charged in Count I of the indictment with intentionally causing the death of Julio Barrios by shooting Barrios with a firearm while in the course of committing the robbery of Barrios.[56] Appellant concedes in his appellate brief that "[t]he undisputed evidence adduced during [his] trial reveals that [he] shot and killed Barrios in the course of taking between 30 and 40 ecstasy pills from Barrios without paying for these pills." However, appellant maintains that the record does not contain evidence proving that he committed "robbery" by using or threatening to use force or violence in order to obtain "property."

The robbery statute provides:

---

[54] *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

[55] *Id*. at 319.

[56] *See* TEX. PENAL CODE § 19.03(a)(2).

> A person commits an offense if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the *property*, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.[57]

Appellant maintains that there "is no definition of 'property' in Chapter 31 of the Texas Penal Code" or elsewhere in the Penal Code, and therefore, "the 'plain language' definition of the term 'property' must be ascertained." He refers us to Black's Law Dictionary, which defines "property" as: the "right to possess, use, and enjoy a determinate thing (either a tract of land or a chattel)" or "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised."

Appellant argues that ecstasy pills are not "property" that a person has a right to possess, use, or enjoy because their possession is a felony offense under Texas law.[58] Thus, appellant posits, even if he appropriated the ecstasy pills without Barrios's consent, he could not have committed the robbery of Barrios because Barrios could not be the lawful "owner" of the pills. He insists that, "[t]o hold otherwise would be to conclude that the term 'property,' as used in the Texas Penal Code[,] is a superfluous word which includes every 'thing' in the universe, irrespective of whether that 'thing' is capable of being legally owned or possessed."

Contrary to appellant's assertions, both Chapter 31 and Chapter 29 of the Texas Penal

---

[57] TEX. PENAL CODE § 29.02(a) (emphasis added).

[58] *See* TEX. HEALTH & SAFETY CODE §§ 481.103(a)(1), 481.116(a).

Code define the term "property." The Penal Code defines "property" in part as "tangible or intangible personal property including anything severed from land[.]"[59] Black's Law Dictionary defines "tangible personal property" as: "[c]orporeal personal property of any kind; personal property that can be seen, weighed, measured, felt, or touched, or is in any way perceptible to the senses . . . ."[60] "In a broad and general sense, 'personal property' includes everything that is the subject of ownership not coming under the denomination of real estate."[61] Further, the Penal Code defines an "owner" as "a person who: (A) has title to the property, possession of the property, *whether lawful or not*, or *a greater right to possession of the property* than the actor[.]"[62]

The ecstasy pills that appellant took from Barrios were personal property that could be seen, weighed, measured, felt, and touched. As the person in possession of the pills who was negotiating their sale, Barrios had a greater right to possess them than appellant.[63] Thus, the ecstasy pills constituted "property" for the purposes of the robbery statute. And, viewed in the light most favorable to the verdict, the record supports the jury's finding that appellant

---

[59] TEX. PENAL CODE §§ 29.01(2), 31.01(5).

[60] *Property—tangible personal property*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[61] *Erwin v. Steele*, 228 S.W.2d 882, 885 (Tex. Civ. App.—Dallas 1950, writ ref'd n.r.e.).

[62] TEX. PENAL CODE § 1.07(35) (emphasis added).

[63] *Cf. Robertson v. State*, 871 S.W.2d 701, 707 (Tex. Crim. App. 1993) (holding question of whether the victim had a "greater right of possession" of the illegal contraband than appellant was a factual question for the jury); *see also Brown v. State*, 56 S.W.3d 915, 919 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("The literal text of section 1.07(a)(35) could not be more clear; a person may own property even if possession of that property is unlawful.").

murdered Barrios while in the course of robbing him of this property.[64]

In sum, a rational trier of fact could have found beyond a reasonable doubt that appellant was guilty of the capital murder of Barrios. Thus, the evidence is legally sufficient to support the jury's guilty verdict. We overrule appellant's fourth point of error.

## MITIGATION INSTRUCTION

In appellant's fifth point of error, he argues that the trial court erred and caused him egregious harm when it failed to submit to the jury "a correct version of special issue two [the mitigation special issue] in the punishment charge." Appellant urges that the trial court's wording of the mitigation special issue did not track the language mandated by Article 37.071 § 2(e)(1). That provision states that the trial court shall instruct the jurors that, if they return an affirmative finding to each issue submitted under subsection (b), then they must answer the following question:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

The trial court's mitigation special issue verdict form read as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment

---

[64] *See Nguyen v. State*, 982 S.W.2d 945, 948 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (holding that "the legislature intends that there may be a theft or robbery of property that is illegally possessed").

rather than a death sentence be imposed?

Thus, the trial court's instruction omitted the words "without parole" from the statutory instruction. Appellant alleges that this error implied to the jurors that he would become eligible for parole if sentenced to life in prison. He complains that many of the jurors may not have wanted to answer "yes" to this question because they erroneously believed that doing so would entitle appellant to a life sentence with the possibility of parole. He argues that the proper remedy for this charge error is to reform his death sentence to a life sentence.

Appellant concedes that he did not object to the instruction given by the trial court, and therefore his claim must be evaluated for egregious harm under *Almanza v. State*.[65] In *Almanza*, this Court prescribed a process for reviewing a complaint of charge error.[66] A reviewing court must first decide whether a jury instruction is erroneous.[67] If so, the reviewing court must determine whether the instruction harmed the defendant by applying either a "some harm" standard, if the complaint was preserved, or an "egregious harm" standard, if the complaint was not preserved.[68] Errors which result in egregious harm are those that "affect the very basis of the case, deprive the defendant of a valuable right, or

[65] *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985).

[66] *Id.* at 160–74.

[67] *Id.* at 174.

[68] *Id.* at 171; *see also Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006).

vitally affect a defensive theory."[69]  In analyzing whether egregious harm has occurred, we consider the whole record, including:  (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) counsel's arguments; and (4) any other relevant information revealed by the trial record.[70]

Although the verdict form omitted the words "without parole," the trial court's charge advised the jury regarding its consideration of the mitigation special issue that a life sentence in prison would be without parole:

> You are instructed that if you answer that a circumstance or circumstances warrant that a sentence of life imprisonment *without parole* rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the Texas Department of Criminal Justice *for life without parole.*

> You are further instructed that a defendant sentenced to confinement for life without parole *is ineligible for release from the Department of Criminal Justice on parole*.

(Emphasis added).  The jurors were also told during jury selection that death and life without parole were the only punishment options following a conviction for capital murder.  Similarly, the juror questionnaires informed the jurors:

> Under Texas law, if an individual is found guilty of capital murder, he shall be sentenced to either confinement in the Institutional Division of the Texas Department of Criminal Justice (the state prison) for life without parole or to the death penalty.  In other words, a sentence of life imprisonment without parole or death is mandatory upon a conviction for capital murder.

---

[69] *Arteaga v. State*, 521 S.W.3d 329, 338 (Tex. Crim. App. 2017); *Almanza*, 686 S.W.2d at 172.

[70] *Almanza*, 686 S.W.2d at 171; *see also State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016).

The record does not suggest that the jury was confused or asked any questions about this matter. Further, the prosecutor argued to the jurors before their punishment deliberations that the mitigation special issue was "the question that will determine whether or not he receives life without parole or death."

Moreover, the State's punishment phase evidence was strong. In addition to the capital murder of Barrios, the record showed that appellant was a member of a violent prison gang. He had a criminal history involving violent, assaultive conduct. While incarcerated and under lock-down following the instant offense, appellant escaped his cell using a homemade rope in order to assault and injure an older, mentally-ill inmate. He terrorized employees at the Bayou Bar and Grill with a rifle because the establishment did not provide him and his companions with limes for their beers. He violently assaulted a woman at a bowling alley in the presence of a uniformed police officer. And he committed another capital murder in the course of a robbery on Thanksgiving Day, a few weeks before he committed the instant offense.

In sum, our review of the record leads us to conclude that appellant was not egregiously harmed by the erroneous admission of the words "without parole" from the mitigation special issue. We overrule his fifth point of error.

**FAILURE TO DISCLOSE TACIT AGREEMENT WITH WITNESS**

Appellant claims, in his sixth point of error, that the prosecutors in his case failed "to inform the jury that they had entered into a tacit agreement or implied understanding with

Cera to not prosecute her for robbery, tampering with evidence, or any other crime if she testified for the State." In support of this claim, appellant argues that Cera was a party to the robbery and murder of Barrios and tampered with evidence because she:

- knew that appellant had no money to buy the ecstasy pills;

- knew that he first sought a male friend to accompany him to buy the pills;

- accompanied appellant to his friend's house where she knew he had hidden guns;

- did not offer to pay Barrios for the pills or return the pills to him, even after appellant told Barrios he was not "going to pay him shit";

- counted the thirty to forty pills, as appellant instructed her, without objecting that they were only buying four pills;

- hid her SUV, burned or discarded appellant's clothing, burned Barrios's shoe, and cleaned Barrios's blood from her SUV; and

- in light of Herrera's testimony, may have discharged a firearm.

Appellant contends that, because Cera cooperated with law enforcement and the State did not prosecute her for robbery, murder, tampering with evidence, or any other crime, there must have been "a tacit or implied agreement" not to prosecute her in exchange for her testimony. He complains that the State created a false impression "that [Cera] was merely an innocent person [who] accompanied Valdez to make a $40 ecstasy purchase [and] who had engaged in no criminal wrongdoing for which she could be prosecuted." Citing *Giglio v. United States*,[71] he asserts that the State violated his due process rights by failing to disclose the tacit leniency agreement he assumes existed.

_____

[71] *Giglio v. United States*, 405 U.S. 150 (1972).

The State argues that appellant failed to preserve error because he did not raise this issue during Cera's testimony, in a motion for a new trial, or in a motion for a continuance.[72] The evidence of Cera's alleged complicity now described by appellant was before the jury, and yet appellant never objected that the State failed to disclose a leniency agreement or requested a continuance on that basis.

Appellant counters that the State's suppression of a tacit immunity agreement with a material witness represents the type of fundamental due process violation that excuses him from error preservation requirements. He cites *Saldano v. State* in support of this assertion, but *Saldano* does not help him. In *Saldano*, we held that the failure to object to evidence in a timely and specific manner during trial forfeits complaints about its admissibility, "even though the error may concern a constitutional right of the defendant."[73]

Appellant additionally argues that he was not obligated to object at trial to preserve this claim because *Brady* imposes a duty on the State to disclose evidence favorable to the defense and does not impose a duty on the defense to "ferret out the secret and tacit agreements." However, if, as appellant contends, the trial record contains "overwhelming evidence that a tacit or implied immunity agreement was reached between the State and Veronica Cera which was never disclosed[,]" then appellant was obliged to object to this failure to disclose as soon

---

[72] *See* TEX. R. APP. P. 33.1(a).

[73] *Saldano*, 70 S.W.3d at 889; *see also Pena*, 353 S.W.3d at 807.

as the "ground of objection" became apparent, and to obtain a ruling on that objection.[74]

Even if we were to find that appellant was not obliged to adhere to the rules of error preservation in this instance, the authorities he invokes involve dissimilar fact patterns and do not persuade us that he is entitled to relief on the merits.[75]

The instant case is distinguishable from those cases on its facts. Unlike the circumstances presented in the above cases, the record in the appellant's case shows that Cera never made any representations about whether or not she had entered into an agreement

---

[74] *See Pena*, 353 S.W.3d at 807; *see also Wilson*, 7 S.W.3d at 146 ("That subsequent events may cause a ground for complaint to become *more apparent* does not render timely an otherwise untimely complaint.").

[75] *See, e.g.*, *Giglio*, 405 U.S. at 151–53 (finding a violation of due process rights requiring a new trial where a key government witness testified that nobody promised him that he would not be prosecuted, but a prosecutor later stated that he had promised the witness that he would not be prosecuted); *Harris v. State*, 642 S.W.2d 471, 472–74 (Tex. Crim. App. 1982) (holding that the trial court unconstitutionally restricted a defense attorney's attempted cross-examination of a material witness about whether she had been charged with murder in connection with the offense at bar);*Tassin v. Cain*, 517 F.3d 770, 773–74, 781 (5th Cir. 2008) (finding a Fourteenth Amendment violation where the State did not disclose that the defendant's wife–a charged codefendant–was told that she would most likely receive a ten-year sentence in exchange for her testimony, and the wife had testified that "no promises relating to her testimony had been made"); *United States v. Shaffer*, 789 F.2d 682, 685–89 (9th Cir. 1986) (finding that the failure to disclose evidence undermined confidence in the outcome of the defendant's trial where the Government provided defense counsel with a copy of a co-conspirator witness's grand jury testimony and immunity agreement and represented that this was the "complete agreement" and "no separate secret or other agreement was made," but new evidence presented at a motion for new trial hearing showed that the witness had retained additional assets and benefits in exchange for his cooperation).

Appellant quotes a passage, ostensibly from *Harris*, but apparently extracted from *Duggan v. State*. Such inaccurate citation does not comply with our briefing rules. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). In *Duggan*, two accomplices testified that no leniency agreement existed, but the prosecutor later admitted telling the accomplices that he would consider leniency in exchange for their testimony. 778 S.W.2d at 468.

We are not required to follow federal intermediate court interpretations of a federal constitutional right, though we may find the reasoning in those cases persuasive. *See Guzman v. State*, 85 S.W.3d 242, 249 n.24 (Tex. Crim. App. 2002).

(either express or tacit) with the State or whether she had been assured that she would receive leniency in exchange for her testimony. Cera did not make misleading statements about such an agreement or understanding because she did not testify about the subject at all. Further, appellant has not cited to any other evidence in the record affirmatively demonstrating that any such agreement or understanding ever existed or showing whether Cera was ever charged with a crime in connection with these events.[76] Appellant suggests that Cera could have been charged with an offense such as tampering with evidence; but this does not in itself prove that Cera had an express or implied arrangement with the State for leniency in exchange for her testimony.[77] In addition, in her 2010 interview with Detective Samaniego, Cera indicated that the detective had not promised her anything or threatened her.

Thus, the record in this case does not demonstrate that the State failed to disclose an immunity or leniency agreement, express or tacit, or failed to correct misleading testimony. We overrule appellant's sixth point of error.

---

[76] Appellant is essentially asserting that unicorns *must* exist, and then, pointing to the rhinoceros—a four-legged animal with horns on its nose—as "almost conclusive proof" that the asserted animals *can* exist and has merely not been discovered yet. *See* Appellant's Br. at *120 (alleging the lack of prosecution of Cera necessitates the existence of a tacit or implied quid pro quo agreement between Cera and the State). Claiming he has met the burden of proof, Appellant then demands the State prove its negative. Although "absence of evidence is not evidence of absence," to require the State to conclusively prove the negative would be absurd in this case because it is impossible.

[77] *See, e.g.*, *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002) ("Without an agreement, no evidence was suppressed, and the [S]tate's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation"); *Shabazz v. Artuz*, 336 F.3d 154, 165 (2nd Cir. 2003) ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.").

## ACCOMPLICE-WITNESS INSTRUCTIONS

In points of error 7A and B, appellant alleges that defense counsel rendered ineffective assistance by failing to request accomplice-witness instructions in the guilt-innocence phase jury charge regarding the roles of Cera, Ramirez, Herrera, and Rosales in the capital murder or a lesser-included offense. Appellant argues in point of error 7C that the trial court erred by failing to *sua sponte* give an accomplice-witness instruction regarding Cera's role in the capital murder or a lesser-included offense. We will discuss these points of error together because they are interconnected and share common legal authorities.

### *The Accomplice-Witness Rule*

Under Texas Code of Criminal Procedure 38.14, "[a] conviction *cannot be had* upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." The testimony of one accomplice witness may not be used to corroborate that of another accomplice witness.[78] "Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration."[79] Because of the requirement that a conviction "cannot be had" on the accomplice-witness testimony alone, if the issue is raised by the evidence, then the jury *must* be instructed accordingly, inasmuch as the accomplice-witness rule becomes the "law applicable to the

---

[78] *Moron v. State*, 779 S.W.2d 399, 401 (Tex. Crim. App. 1985).

[79] *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

case." [80]   Thus, when an accomplice witness's testimony implicates the defendant in the charged offense, the accomplice-witness instruction is law applicable to the case, and the trial court must instruct the jury even without a request.[81]

"A proper accomplice-witness instruction informs the jury either that a witness is an accomplice as a matter of law or that he is an accomplice as a matter of fact."[82]   An accomplice is a person who, "under the evidence, could have been charged with the same or lesser-included offense as that with which the defendant was charged."[83]   If the accomplice is one "as a matter of law," then that witness either *has* been charged with the same offense as the defendant or a lesser-included offense, or "the evidence clearly shows that the witness *could* have been so charged," and the court's charge *tells the jury* that the witness is an accomplice and that his or her testimony must be corroborated.[84]   But if the evidence is conflicting or inconclusive, then the accomplice is one "as a matter of fact," and the jury instruction *asks the jury* to decide (1) whether the witness is an accomplice as a matter of fact,

---

[80] TEX. CODE CRIM. PROC. art. 36.14; *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013) ("An examination of the plain language in the accomplice-witness statute reveals that it is, in all its variations, the law applicable to the case rather than a defense issue"); *State v. Ambrose*, 487 S.W.3d 587, 594 (Tex. Crim. App. 2016) (citing *Zamora*, 411 S.W.3d at 513).

[81] *Zamora*, 411 S.W.3d at 513.

[82] *Id*. at 510 (citing *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006)).

[83] *Id.* at 510 (citing *Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999) (noting that defendant is "entitled to an accomplice-witness instruction if and only if 'there is sufficient evidence in the record to support a charge against the witness alleged to be an accomplice'").

[84] *Zamora*, 411 S.W.3d at 510 (citing *Cocke*, 201 S.W.3d at 747-48; *Druery*, 225 S.W.3d at 499) (emphasis added).

and *only* if so, (2) whether the testimony of the witness is corroborated by other evidence tending to connect the defendant with the offense committed.[85]

We recently explained that a witness is an accomplice as a matter of law in the following situations:

•    If the witness has been charged with the same offense as the defendant or a lesser-included offense;

•    If the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant; and

•    When the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice.[86]

If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly and the failure to do so is error.[87]   Where the witness is not charged with the same offense as the defendant or a lesser-included offense, and the evidence is "not uncontradicted or so one-sided that a rational jury" would have had to believe that the witness was an accomplice, the defendant is not entitled to an accomplice-as-a-matter-of-law instruction.[88]

If the record contains evidence that a witness may have been an accomplice or the

---

[85] *Id.*

[86] *Ash v. State*, No. PD-0244-16, 2017 WL 2791727, slip. op. at *5–6 (Tex. Crim. App. June 28, 2017).

[87] *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002).

[88] *Ash*, 2017 WL 2791727, slip op. at *16.

evidence is conflicting, then the issue should be submitted to the jury to decide whether the witness was an accomplice as a matter of fact.[89]  If the evidence demonstrates that a witness is not an accomplice, then the trial judge is not obliged to instruct the jury on the accomplice-witness rule—as a matter of law or fact.[90]

*Ineffective Assistance of Counsel*

In *Strickland v. Washington*,[91] the Supreme Court established a two-prong test for evaluating ineffective-assistance claims.[92]  To obtain a reversal of a conviction under the *Strickland* test, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding.[93]  This prejudice means that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[94]

---

[89] *Id.*, slip op. at *12, *16.

[90] *Smith*, 332 S.W.3d at 440.

[91] *Strickland v. Washington*, 466 U.S. 668 (1984).

[92] *Id.* at 687.

[93] *Id.*

[94] *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991) (citing *Strickland*, 466 U.S. at 694).

Appellant asserts that counsel performed deficiently in failing to request an accomplice-witness instruction regarding Cera because "the evidence adduced at trial definitely links Cera to being at least a party to the 'robbery' of Barrios, even if it was not her intent to shoot or kill Barrios." He focuses on Cera's statements that she counted the thirty to forty ecstasy pills, that she knew that appellant tried to recruit a male friend to come with him, that they stopped at appellant's friend's house where she knew he had stored some guns, and that she concealed and destroyed incriminating evidence in her SUV, such as Barrios's shoe and his blood. Appellant contends that, had Cera's intent been merely to purchase the pills, she would not have continued counting the pills after he declared that he was not going to pay Barrios.

Appellant points to Cera's August 29, 2012 police statement in which she said that she told appellant after he shot Barrios that he should have just "hit" him. He argues that her intent that appellant hit Barrios at least made her an accomplice-witness to a robbery. He also highlights Herrera's testimony that he saw a "flash" coming from the passenger side of the SUV, arguing that this testimony showed that Cera shot a gun during the robbery. Appellant further contends that counsel's error harmed him because the omission of an accomplice-witness instruction concerning Cera "prevented the jury from acquitting him, finding him guilty of a lesser[-]included offense, or assessing a lesser punishment based on what constituted almost totally accomplice-witness testimony."

In this case, appellant claimed that his attorney was ineffective for failing *to request*

an accomplice-witness instruction, and he claimed that the trial court erred in failing to *sua sponte* include an accomplice-witness instruction. He did not expressly include a claim that his attorney was ineffective for failing *to object* to the omission of such an instruction. Nevertheless, we will read appellant's failure-to-request point of error liberally to encompass the failure-to-object claim since the asserted harm is the same. With regard to Cera, even given this liberal interpretation, appellant cannot meet the second prong of *Strickland* because he cannot demonstrate prejudice.[95] Appellant maintains that counsel's omission was prejudicial because the non-accomplice testimony was "sparse." However, the trial record reflects that the State presented a substantial amount of non-accomplice corroborating evidence connecting appellant to the offense. This evidence included the testimony of Herrera, Ramirez, Jurado, Rosales, various law enforcement witnesses, and appellant's ex-wife, along with appellant's cell phone records and cell site location data. Collectively, that non-accomplice evidence established that:

- Appellant was addicted to drugs and stole to support his habit;

- On the day of the offense, appellant was driving Cera's white SUV, wearing gray sweatpants, a gray sweatshirt, and glasses, and was seeking Xanax and ecstasy pills;

- Ramirez called Barrios on the day of the offense and handed the phone to appellant so that appellant could arrange the purchase of ecstasy pills from Barrios;

- Appellant and Barrios were overheard negotiating a deal in which appellant would purchase thirty to forty ecstasy pills from Barrios in exchange for $300, even

---

[95] *See Strickland*, 466 U.S. at 694.

though appellant had just asked Jurado to lend him money for gas;

• Appellant and Barrios exchanged numerous phone calls on the day of the offense; they were speaking with each other on the phone as Herrera drove Barrios to the location of the prearranged ecstasy deal; and the calls between appellant and Barrios ceased right before Barrios was murdered;

• Cell site location records revealed that appellant's phone was located in close range of the shooting within minutes of the shooting;

• Herrera testified that Barrios got into the SUV, Herrera heard gunshots coming from the SUV, and the Herrera saw the driver of the SUV–who was tall and thin and wore glasses and a gray hooded sweatshirt–pull Barrios out of the vehicle, shoot Barrios on the ground, then turn and shoot at Herrera;

• An eyewitness to the shooting (Zozaya) described the driver of the SUV as tall and thin and wearing a gray "hoodie" sweatshirt and glasses;

• Six days after the offense, Herrera identified appellant in a photo line up as the driver of the white SUV, noting the appellant's eyes, glasses, and slim face, and he also identified appellant in the courtroom;

• After Cera later led police to where she had hidden the white SUV, forensic testing revealed that blood spatter found inside the vehicle and on its tire well yielded DNA profiles consistent with Barrios's DNA;

• After the offense, appellant told witnesses that something bad had happened and "everything had gone down wrong." Jurado asked appellant, "[W]hat happened to the little boy?" Appellant told her not to worry about it, acted "all pissed off[,]" and hung up on her.

Appellant suggests that the jury should have doubted or disregarded the above evidence that was based on the testimony of Herrera, Ramirez, and Rosales because these witnesses were themselves accomplices.[96] However, appellant has not demonstrated that Herrera, Ramirez,

---

[96] Accomplice witnesses cannot corroborate each other. *Moron v. State*, 779 S.W.2d at 401.

and Rosales acted as his accomplices. Point of error 7A is overruled.

In support of point of error 7B—that defense counsel was ineffective for failing to request an accomplice-witness instruction regarding Ramirez and Herrera[97]—appellant contends that Ramirez assisted him in arranging the sale of the ecstasy pills by facilitating his communications with Barrios. He also states that Herrera transported Barrios to the location of the planned drug deal and Barrios handed Herrera about ten sandwich bags. Therefore, appellant argues, Herrera and Ramirez engaged in illicit drug dealing which "is certainly dangerous conduct which can result in a person's death" and they are guilty of felony murder.[98] He maintains that the fact that Herrera and Ramirez may not have intended to murder Barrios is irrelevant because the doctrine of transferred intent applies to felony murder. Appellant's arguments have no merit.

The record shows that Herrera drove Barrios to the specified location on Waldorf Street and held the sandwich bags because Herrera believed that Barrios intended to purchase marijuana from someone for recreational use. Herrera did not know appellant and we see no evidence that Herrera knew of appellant's intent to harm or rob Barrios. The record also

---

[97] Appellant also complains that counsel failed to request an accomplice-witness instruction regarding Rosales (Barrios's girlfriend). However, he offers no facts or legal argument to support his claim that Rosales was an accomplice witness and we see no evidence in the record to support this contention. His claim regarding Rosales is inadequately briefed and we will not consider it. *See* TEX. R. APP. P. 38.1(i).

[98] *See* TEX. PENAL CODE § 19.02(b)(3) ("A person commits an offense if he: . . . commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.").

suggests that Herrera was distraught that Barrios had been shot, and he chased after the SUV wielding a crowbar as appellant fled the scene.

The record indicates that Ramirez called Barrios on appellant's behalf because appellant wanted to buy ecstasy pills. There is no evidence in the record that Ramirez knew that appellant intended to hurt or rob Barrios. Appellant argues that Ramirez knew that he did not have any money to purchase the pills, but the record merely shows that Ramirez did not see appellant with money. The record also shows that, when appellant told Ramirez after the shooting that "everything got ruined" and asked Ramirez not to tell Jurado, Ramirez did tell Jurado and they both began calling appellant to find out what had happened.

Thus, although Herrera and Ramirez may have had some limited involvement in planning the unlawful purchase of a controlled substance, they were never charged with, nor was there evidence to support the assertion that they *could* they have been charged with, the capital murder of Barrios or any lesser-included offense of that capital murder. The record does not indicate that these witnesses performed an affirmative act promoting the commission of the murder, possessed the required culpable mental state, or had reason to anticipate that a life would be taken.[99] Because there is nothing to support a claim that the trial court

---

[99] *See id*.; *see also* TEX. PENAL CODE § 19.03(a)(2) (providing that a person commits capital murder when he commits murder as defined under § 19.02(b)(1) and . . . "*intentionally* commits the murder in the course of committing or attempting to commit . . . robbery"); § 19.02(b)(1) (providing that a person commits murder if he "*intentionally or knowingly* causes the death of an individual") (emphasis added); *see also Druery*, 225 S.W.3d at 498; *Kutzner v. State*, 994 S.W.2d 180, 188 (Tex. Crim. App. 1999) (stating that complicity with an accused in the commission of another offense does not make a witness an accomplice in the offense for which the accused is on trial).

(continued...)

erroneously failed to include an accomplice-witness instruction related to Herrera and Ramirez, appellant's counsel was not ineffective for failing to object to the omission of such an instruction. Appellant has failed to meet his burden to demonstrate both deficient performance and prejudice as required by *Strickland*. Point of error 7B is overruled.

Regarding point of error 7C, appellant concedes that this Court must review under *Almanza's*[100] egregious harm standard any error the trial court committed in failing to *sua sponte* give an accomplice-witness instruction because his counsel did not request such an instruction or object to its omission.[101] Emphasizing many of the same facts as he did in point of error 7A, *supra*, appellant asserts that Cera conspired with him to rob Barrios of the ecstasy pills, concealed and destroyed evidence by cleaning and hiding her SUV and burning clothing, and initially lied to the police. Thus, he contends, the trial court should have *sua sponte* instructed the jury that Cera was an accomplice-witness, and egregious error resulted from the

---

[99](...continued)

Appellant correctly asserts that felony murder can be a lesser-included offense of capital murder. *See Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999). However, the elements of felony murder include the requirement that the individual in question "commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3). Even if Ramirez and Herrera could have been charged with a felony controlled-substance offense as a result of their limited involvement in this case, there is no evidence that either of them committed an act clearly dangerous to human life that caused Barrios's death. Indeed, appellant's argument would have a nonsensical result, e.g., a person who merely agreed to give a family member a ride, knowing the family member might purchase some marijuana, would thereby become an accomplice to the capital murder of his own family member.

[100] 686 S.W.2d at 160–74.

[101] *See Zamora*, 411 S.W.3d at 512–13 ("Our review of the underlying principles of *Almanza* compels us to conclude that all complaints about the trial court's failure to include an accomplice-witness instruction must be analyzed under its procedural framework.").

trial court's failure to do so.[102]

Given the evidence of Cera's involvement in the events at issue and her destruction of evidence after the crime, an instruction as to whether she was an accomplice as a matter of fact may have been appropriate in the instant case.[103] As explained above, however, even if we assume, without deciding, that the trial court erred in failing to *sua sponte* give such an accomplice-witness instruction, we nevertheless conclude that appellant has not demonstrated that he was egregiously harmed by the omission. "Article 38.14, by its very terms, requires only that there 'be some non-accomplice evidence tending to connect the defendant to the crime, not to every element of the crime.'"[104] In evaluating the non-accomplice evidence, we assess its reliability or believability and the strength of its tendency to connect the defendant to the crime.[105] "Under the egregious harm standard, the omission of an accomplice[-]witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'"[106]

In closing arguments, defense counsel emphasized Cera's false statements and other

---

[102] *See Almanza*, 686 S.W.2d at 172.

[103] *See Ash*, slip op. at *12, *16.

[104] *Ambrose*, 487 S.W.3d at 598 (quoting *Vasquez v. State*, 56 S.W.3d 46, 48 (Tex. Crim. App. 2001)).

[105] *Id*.

[106] *Id*. (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)).

evidence suggesting her complicity in the offense and her lack of credibility. The State in turn pointed the jury to evidence from other sources, such as phone records and the testimony of other witnesses, corroborating Cera's testimony. We previously summarized the non-accomplice corroborating evidence in our discussion of point of error 7A. We find appellant has not demonstrated that the non-accomplice evidence was "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."[107] Therefore, he has not shown that the failure to include an accomplice-witness instruction egregiously harmed him. We overrule point of error 7C.

## PHOTOGRAPHIC LINEUP

Appellant contends in point of error eight that the trial court erred in allowing the State to introduce the photographic lineup shown to Herrera, in which Herrera identified him as the person who shot and killed Barrios. The complained-of photo array (State's Exhibit 13) consisted of six photographs of similar-looking men with mustaches. Herrera had circled appellant's photo in the upper-right-hand corner of the array, signed the array next to this image, and wrote the date, December 16, 2010. Appellant alleges that the lineup exhibit constituted inadmissible hearsay offered for the truth of the matter asserted by Herrera, i.e., that appellant was the shooter.[108]

When the State offered the lineup exhibit at trial, defense counsel made the following

---

[107] *See id.*

[108] *See* TEX. R. EVID. 801(d) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

objection:

> Your Honor, I'm going to object. I'm going to object on the grounds of being -- this is improper bolstering of the identification. I mean, if he can identify him in court, that's one thing. And if he can't identify him in court, then that would be relevant and admissible, but for her to do it both ways . . . It's not so much the identification. I'm not objecting to him saying that he identified him six days after the incident. What I'm objecting to is the admission . . . of this photo lineup, because then she's bolstering his identification then . . . and now.

Thus, appellant's counsel objected to the photo lineup on the basis of improper bolstering. Appellant now argues that "'bolstering' has ties to Texas Rule of Evidence 613(c), which involves prior consistent statements and reiterates principles of hearsay." He therefore contends that his "bolstering" objection preserved a hearsay claim regarding the photo array. He asserts that the harm to him was substantial, since Herrera was the only witness other than Cera who identified him.

Texas Rule of Appellate Procedure 33.1(a) provides, in relevant part, that for a complaint to be presented on appeal, a timely request, objection, or motion must have been made to the trial court. The request, objection, or motion must have stated the grounds for the ruling that the complaining party sought with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.[109] Additionally, it is well settled that the legal basis of a complaint raised on appeal must

---

[109] TEX. R. APP. P. 33.1(a)(1)(A).

comport with the objection raised at trial.[110] In determining whether a complaint on appeal comports with an objection at trial, we look to the objection's context and the parties' shared understanding at the time.[111]

"Bolstering" occurs when a party improperly uses "an item of evidence" to "add credence or weight to some earlier unimpeached piece of evidence already offered by the same party."[112] Historically, a witness's testimony bolstering a eyewitness's identification of the accused was not allowed because the testimony was considered to be hearsay.[113]

However, in the instant case, appellant specifically objected to the admission of the photo array itself and not a witness's testimony concerning the out-of-court identification. Texas Rule of Evidence 801(e)(1)(C) provides that, "A statement is not hearsay if: The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: . . . one of identification of a person made after perceiving the person."[114] Thus, the rule defines a statement, such as the one Herrera made when he signed the photo array, as non-hearsay if: the declarant testifies, he is subject to cross-examination concerning the statement, and the statement is one identifying a person made after perceiving

---

[110] *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

[111] *Id.*

[112] *Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App. 1988).

[113] *See Thomas v. State*, 811 S.W.2d 201, 208 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (citing *Frison v. State*, 473 S.W.2d 479, 481 (Tex. Crim. App. 1971) (holding that testimony from a detective that the complainant identified the defendant as one of several robbers was "rank hearsay")).

[114] Tex. R. Evid. 801(e)(1)(C) (2014).

him.[115]

Assuming, *arguendo*, that appellant preserved his hearsay claim by objecting to the array on the basis of improper bolstering, he nonetheless cannot prevail on the merits due to Rule 801(e)(1)(C). Herrera testified at trial and was subject to cross-examination. The complained-of exhibit conveys Herrera's out-of-court identification of appellant as the shooter after he perceived appellant during the shooting. In sum, State's Exhibit 13 was not hearsay. Appellant's eighth point of error is overruled.

## CONSTITUTIONALITY OF FUTURE DANGEROUSNESS SPECIAL ISSUE

In his ninth point of error, appellant avers that the statutory future dangerousness special issue violated his due process rights under the Fourteenth Amendment.[116] Appellant alleges that this special issue is unconstitutional on its face because it does not define the term "probability" and it is "unduly vague." He argues that the statutory special issue, as it is currently worded, warrants a "yes" finding whenever there is any possibility of future acts of criminal violence, no matter how remote the possibility, which makes virtually every person convicted of capital murder a "future danger."

---

[115] *See Thomas*, 811 S.W.2d at 208; *see also Sanders v. State*, No. 09-16-00004-CR, slip op. at 5 (Tex. App.— Beaumont June 21, 2017, no pet. h.) ("[B]y adopting Rule 801(e)(1)(C) . . . the Court of Criminal Appeals adopted a rule that expressly allowed a party to elicit testimony from a witness regarding the witness's prior out-of-court identification of the defendant.").

[116] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1).

We have addressed and rejected substantially similar constitutional challenges.[117]

Appellant has not persuaded us to reverse our longstanding precedent. We overrule his ninth

point of error.

**COUNSEL'S CONCESSION THAT APPELLANT COMMITTED MURDER**

In point of error ten, appellant argues that his counsel rendered constitutionally

ineffective assistance by conceding to the jury that appellant had committed "murder, plain

and simple."[118] He contends that counsel's strategy of admitting appellant's involvement in

the murder conflicted with counsel's strategy in requesting a charge on the lesser-included

offense of manslaughter and urging the jury to find appellant guilty only of manslaughter.

Appellant also argues that the concession conflicted with counsel's interpretation of the

evidence that "Cera was the actual killer." Appellant maintains that counsel should only have

conceded that appellant was guilty of robbery, not murder.

In closing arguments at the guilt or innocence phase of trial, defense counsel made the

following statements:

When you hear something from two people and one is being selective and one

---

[117] *See, e.g., Russeau v. State*, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009) (holding that the trial court did not violate the defendant's due process rights in failing to define "probability," where the defendant argued that, in common usage, the term "probability" can mean "any possibility" and "a juror would have been compelled to answer the first special issue 'yes' if [he was] convinced that there was even the remotest probability of future violence by appellant"); *Gardner v. State*, 306 S.W.3d 274, 302-03 (Tex. Crim. App. 2009) (holding that the terms "probability," "criminal acts of violence," "militates," and "continuing threat to society" are not statutorily defined, and therefore the jury should give them their "commonly accepted meanings").

[118] Appellant Br. at 144; 52 Rep. R. 39–40.

is not -- when one side only gives you the good and the other side is presenting everything else, that should tell you something about what they think in their case and how they prepared for it and how their police investigated it, if they investigated anything at all. Now, I'm going to save you some time, and hopefully I'll save the [S]tate some time, and we can end this closing argument relatively quickly. . . .

Fidencio Valdez is involved in this murder. Plain and simple. You've heard it from me. There is no -- I think if I stood up here and told you, "It wasn't him." You know, "They didn't prove it" -- let me ask you this . . . How many times did I ask one of those witnesses, "Now, you can't prove he's the person using that phone, can you?" . . . How many times did you hear me ask that? That's the defense of "I'm not there. It wasn't me." . . . You didn't hear me ask that one time. Not once. And the very first 15 minutes of my argument I'm telling you he's there. We know he's there, because Forest Zozaya tells you, "I saw a guy with glasses." . . .

So what am I doing? Our defense has always been, from the very beginning -- and it is today, it was yesterday, it is now -- this is a drug deal gone bad. That's all it is. This is two people in a suspicious situation where there's not a lot of trust, where it's dangerous, and it went south. That's all.

Again, don't waste your time. Yes, he's there. He's in the car. It's his phone. He's at the murder scene. He's seen shooting someone else, Julio Barrios. So let's move past that.

Counsel discussed weaknesses in the State's case, including the problems with Cera's credibility and the evidence showing that Barrios was a drug dealer, not a "little boy," despite the State's witnesses' contrary testimony. Counsel cautioned the jurors that the State was not giving them the whole story, and he suggested that the defense was being completely honest with them. He discussed the fact that appellant had accused Barrios of wearing a wire and emphasized the fear and distrust inherent in drug deals. Counsel then argued,

So something bad happened between these two guys, and Barrios got shot. That's it. That's this case. That's all there is. It's a drug deal gone bad.

Now, whether you want to believe it's reckless, or whether you want to believe it's intentional, that's your -- I'm not going to go there. You decide which one you want to believe. . . .

I think this -- this is -- there's one verdict in this case with regards to the count of the shooting of Barrios, and that's murder. If you feel it's manslaughter, you can go there, but this -- there's one verdict.

There's no robbery. In order to get to robbery you have to disregard all of the inconsistencies of everybody else telling you what happened. . . . You have to disregard the selectiveness. You have to disregard the incomplete investigation, the lack of ballistics, the lack of blood testing in the car, the lack of luminol, the lack of people being shown everything, good and bad, and you've got to just accept the fact that they were sloppy and, "Well, you know, we'll cut them a break because they're the [S]tate."

Our review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable professional assistance.[119] "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been grounded in legitimate trial strategy,[120] we will

---

[119] *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007).

[120] In *McCoy v. Louisiana*, the Supreme Court held that "a defendant has the right to *insist* that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. *McCoy v. Louisiana*, 138 S. Ct. 1500, __(2018) (emphasis added). However, in *McCoy*, the defendant, while on the record, affirmatively denied any guilt and protested to the court his objections to his trial attorney's chosen defense strategy of admitting guilt in favor of the hope of a lesser-included charge. *Id*. at __. Here, the record contains no challenge to show that counsel's strategy was not in line with the defendant's objective. *See id*. at __ ("[W]hen counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, 'no blanket rule demands the defendant's explicit consent' to implementation of that strategy." (citing *Florida v. Nixon*, 543 U.S. 175, 181 (2004)). For our purposes here, Appellant presents no evidence in the record to overcome the presumption of competent

(continued...)

defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."[121] In the majority of cases, the record on direct appeal is simply undeveloped and insufficient to permit a reviewing court to fairly evaluate the merits of an ineffective assistance of counsel claim.[122]

In particular, judicial review of counsel's closing arguments is highly deferential: "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."[123] Further, when a defense attorney was faced with overwhelming evidence of his client's involvement in the offense, we have found that conceding the defendant's guilt of a lesser-included offense in an apparent attempt to persuade the jury to find him guilty of the lesser offense, rather than the charged offense, was a reasonable trial tactic.[124]

In the instant case, counsel's reasons for his actions do not appear in the record, and his conduct could have been part of a reasonable trial strategy. Without more, we must defer

---

[120](...continued)
representation.

[121] *Garza*,213 S.W.3d at 348.

[122] *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

[123] *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

[124] *Hathorn v. State*, 848 S.W.2d 101, 118 (Tex. Crim. App. 1992); *see also Jordan v. State*, 859 S.W.2d 418, 422 (Tex. App.—Houston [1st Dist.] 1993, no pet.) ("It is logical to conclude that trial counsel, faced with overwhelming evidence of appellant's guilt, chose to placate the jurors rather than to possibly antagonize them with an impassioned, though weakly supported, plea for a verdict of not guilty.").

to counsel's decisions and deny relief. We overrule appellant's tenth point of error.

## PUNISHMENT CHARGE ERROR

In his eleventh point of error, appellant contends that the trial court egregiously erred in submitting an allegedly incomprehensible jury instruction regarding the jury's consideration of the future dangerousness special issue. He asserts that the instruction failed to comply with the wording required by Article 37.071 § 2(d)(1). The statute provides that the trial court shall charge the jury that:

> (1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that *militates for* or mitigates against the imposition of the death penalty[.][125]

The instruction that the trial court in appellant's case actually submitted to the jury read:

> In deliberating on Special Issue Number One you shall consider all the evidence at the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that *mitigates for* or mitigates against the imposition of the death penalty.

(Emphasis added). Thus, the instruction actually submitted to the jury in this case did not comply with Article 37.071 § 2(d)(1) because it used the words "mitigates for" where the statute indicates that the instruction should have used the words "militates for."

Appellant argues that this deviation rendered the instruction incomprehensible because the word "mitigate" means to "make less severe, serious, or painful." He contends that a

---

[125] TEX. CODE CRIM. PROC. art. 37.071 § 2(d)(1) (emphasis added).

"person can never consider evidence which 'mitigates for' the death penalty; he or she can only consider evidence which mitigates 'against the death penalty.'" Appellant concedes that, because his trial counsel did not object to the erroneous jury instruction, he must show egregious harm to prevail on appeal.[126]

We agree that appellant must show egregious harm. Therefore, we must determine whether the charging error affected the very basis of the case, deprived appellant of a valuable right, or vitally affected his defensive theory.[127] In doing so, we consider the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information.[128] Where faced with a claim that a jury instruction is ambiguous, the reviewing court should use common sense to determine whether there is a reasonable likelihood that the jury was misled by the ambiguity.[129]

Appellant complains that no other part of the jury charge informed the jury of the correct language required by Article 37.071 § 2(d)(1). The State responds that the court's charge correctly instructed the jury to consider all the evidence presented at the guilt-innocence and punishment phases of trial, including evidence that *mitigates against the death penalty*, in answering the special issue. The erroneous part of the instruction was the portion

---

[126] *See Almanza*, 686 S.W.2d at 171.

[127] *Id.*

[128] *Id.*

[129] *See Mireles v. State*, 901 S.W.2d 458, 460 (Tex. Crim. App. 1995) (citing *Boyde v. California*, 494 U.S. 370 (1990)).

that should have called the jury's attention to evidence that *militated for* the imposition of the death penalty. Thus, the State asserts, the party that suffered a disadvantage due to the charging error, if any, was the State, not appellant. We agree. We overrule his eleventh point of error.

## PETIT JURY SELECTION

Appellant complains in his twelfth point of error that the trial judge, over defense counsel's objection, declined to follow the statutory procedure set out in Article 35.13 for selecting a petit jury in a death penalty case. Appellant contends that Article 35.13 mandates that a jury in a capital case in which the State is seeking the death penalty "shall be passed for acceptance or challenge first to the [S]tate and then to the defendant." Appellant maintains that, though defense counsel requested that the statutory procedure be followed, the trial judge nevertheless used his "own unique procedure." Appellant maintains that the trial judge allowed both sides to make challenges for cause and then, after a sufficient number of qualified venire persons were selected to seat a jury, the judge instructed the State and the defense to make their peremptory strikes.

The State responds that appellant invited the alleged error he now complains of by filing a written pretrial motion requesting that the trial court not strictly comply with Article 35.13. Thus, the State avers, appellant should be estopped from complaining about the trial court's failure to comply with Article 35.13. The State further contends that the jury selection method used by the trial court was within the court's discretion under the statute because the

State was required to bring its peremptory challenges to each venire member before the defense was required to make its peremptory strike decision.

Appellant does not direct us to the parts of the record revealing the trial court's decision to deviate from the statutory procedure, nor to the point at which appellant's counsel objected to the trial court's actions. Thus, he has not adequately briefed this claim.[130] However, in the interest of justice, we will review his claim.

In February 2012, appellant filed his "Amended Motion to Qualify the Panel Prior to Requiring the Defendant to Exercise his Peremptory Strikes." In this motion, appellant argued that Article 35.13 did not require the State and the defense to make their challenges for cause and peremptory strikes immediately upon passing each juror. He maintained that "[r]equiring the defendant to exercise his peremptory strikes immediately after the juror is passed on individual voir dire denies the defendant the opportunity to intelligently exercise his peremptory challenges." He asked the trial court to qualify and question the entire panel before the State–and then the defense–exercised their peremptory strikes.

At a pretrial hearing held in March 2012, the State agreed to the plan appellant proposed and the trial judge announced that he intended to allow the parties to make challenges for cause at the time the jurors were questioned and to qualify approximately forty-six jurors. The judge told the parties that, following that qualification process, "[o]nce we get there then you can make your peremptory strikes. Is that all right?" The defense attorney and

---

[130] *See* TEX. R. APP. P. 38.1(i); *Bunting v. State*, 482 S.W.3d 58, 106 (Tex. Crim. App. 2016).

the prosecutor both agreed.

After the voir dire of the second venire member[131] in February 2014, the following colloquy occurred between the trial judge and counsel:

> THE COURT: We need to decide how we're going to go -- obviously, the strikes for cause are going to be made immediately, you first and then them. The issue now -- I just want your feelings on it -- and both sides give me their feelings regarding the exercising of peremptory challenges.
>
> Now, I know that some courts, what they have done is basically waited until they have the proper number of jurors qualified then bring them in the courtroom and then give you the opportunity to make your peremptory strikes. I know under the statute I can make you exercise your peremptory strikes now if that be the case. So I want to know -- you know, I certainly want to do this in a way that both sides feel comfortable -- whether, you know -- with however we proceed, but I think that it might move this process a little bit more smoothly, more quickly is [sic], if I force you guys to make your decision on your peremptories now.
>
> And I would welcome your comments on that.
>
> [THE PROSECUTOR]: We had talked about it earlier, Judge -- and I can't remember, so you'll have to correct me if I'm wrong. I thought we had both agreed that we would prefer to qualify the number and do the peremptories at the end.
>
> Was that not your preference?
>
> [DEFENSE ATTORNEY]: No.
>
> [THE PROSECUTOR]: No? You want to do them now?
>
> [DEFENSE ATTORNEY]: Yes.
>
> [THE PROSECUTOR]: Our preference is to qualify the number of jurors we

---

[131] The first venire member was struck for cause based on the State's challenge.

need and say -- and do the peremptories at the very end. . . .

THE COURT: Okay. So let me think. So each side gets 15 strikes each on the peremptories, we go for -- and then if we're going to get alternates -- and we're probably going to get two alternates, I'd probably grant -- I probably would qualify six extra jurors for the alternate pool and then give you two strikes each on the alternate pool. So we're looking at 53 -- about 53 -- about 53, 55 people we'd have to qualify.

[THE PROSECUTOR]: Right. And, really, my argument -- it absolutely benefits the defense as well. They're going to be making these same type of strategic decisions when they're making their peremptory strikes as well. I would assume that they would want to know -- to look at the whole pool and rate them also.

THE COURT: What's your position?

[DEFENSE ATTORNEY]: Your Honor, we're asking for strict adherence to [Article] 35.13. 35.13 is what the legislature -- the legislators have decided what -- or they have set down what -- the way the order should be.

And that is that it be -- that "A juror in a capital case in which the [S]tate has made it known to seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause."

And so we've read that in addition to reading *Bigsby* [sic][132] and *Hughes*[133] -- *Bigsby* [sic] *v. State*, *Hughes v. State* -- to mean that at once the juror has been voir dired, [sic] the [S]tate moves for -- if they so desire -- challenges, strikes, or accepts. And at that point the juror then passes to us, in which then we exercise cause -- or acceptance, cause, or strike.
The reason why this system is -- and it's explained in *Hughes* beautifully, and that is, the [S]tate gains a strategic advantage when they see us challenging for cause before they have decided whether to strike or not.
For example, if the [S]tate does not challenge and then we challenge for cause

---

[132] *Bigby v. State*, 892 S.W.2d 864, 879–80 (Tex. Crim. App. 1994).

[133] *Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App. 2000).

and that's denied, now the [S]tate knows that we've got to exercise a strike on that person. And if they also -- if they move for cause and it's denied and then we move for cause again, we're in a situation now where they know that we don't want the person and therefore they can save a strike knowing that we will strike the -- or at least having an idea of what our hand is going to be that we have to exercise that strike. And it gives the [S]tate an unfair advantage either way because if we wait until the end -- if we challenge for cause and it's denied, they know then they don't have to worry about that juror. More than likely the defense will strike that person. And if that person is objectionable to the [S]tate, then they save a strike, whereas we don't gain that advantage. We don't have that ability.

Defense counsel subsequently conceded that "a trial court has the discretion to decide whether the [S]tate must voice both a challenge for cause or a peremptory challenge before the defendant, or that both sides issue any challenges for cause before the [S]tate lodges its first peremptory." The judge responded that his intention was to have the State make its desired challenges for cause to each juror, the defense make its challenges for cause, the State exercise its peremptory strikes, and then the defense exercise its peremptory strikes. Defense counsel continued to argue that this method could give the State an unfair advantage in a situation where both sides unsuccessfully challenged a juror for cause, because the State could withhold its peremptory strike, knowing that the defense would be likely to exercise one of its peremptory strikes on such a juror. The State continued to ask the trial judge to reserve both sides' peremptory strikes until the parties had assembled a qualified pool of venire members. Defense counsel continued to lobby for the trial judge to proceed juror by juror.

After taking time to read the cases cited by defense counsel, the trial judge ruled that the parties would raise their challenges for cause after each juror was questioned and "then

we will reserve peremptories [for] when we have the 48 jurors." Defense counsel again objected and requested "strict adherence to 35.13." The trial judge responded, "And the way I read the law, this Court has discretion to do it either way, and that's the way I'm going to do it."

Following questioning of each venire member, the trial judge allowed the State to make its challenges for cause and then allowed the defense to make its challenges for cause. After qualifying the requisite number of venire members in April 2014, the trial judge allowed the parties to make their peremptory strikes against each venire member in the qualified juror pool. For each person in the pool, the State exercised its peremptory strike first and then, if the State did not strike the person, the defense could exercise a peremptory strike.

First, we address the State's contention that appellant invited error by filing a written pretrial motion in 2012 asking the trial court to deviate from the procedure set out in Article 35.13. The law of invited error provides that a party cannot complain of an error that it invited or caused.[134] In other words, "[i]f a party affirmatively seeks action by the trial court, that party cannot later contend that the action was error."[135] "To hold otherwise would be to permit him to take advantage of his own wrong."[136] Appellant specifically requested in his pretrial motion that the trial court follow a procedure other than the one dictated by Article

---

[134] *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011).

[135] *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999).

[136] *Woodall*, 336 S.W.3d at 644 (internal citations omitted).

35.13. Thus, argues the State, to the extent that appellant complains about the trial court's ruling on his pretrial motion, he is estopped from seeking appellate relief.

However, this is not a case in which an appellant lay behind the log, induced the trial court to take an action, and then later claimed on appeal that said action was erroneous.[137] Rather, appellant communicated to the trial court shortly after voir dire commenced that he no longer wanted the court to follow the procedure upon which the parties had previously agreed. He argued that the trial court should adhere to the process set out by statute. Because appellant made his change of position clear before any for cause or peremptory challenges were made, he made his complaint "by a timely request, objection, or motion that stated the grounds for the ruling" he sought, and he left adequate time for the State to respond and the trial court to take corrective action, if necessary.[138] Further, appellant obtained an adverse ruling when the judge stated that he had "discretion to do it either way, and that's the way [he was] going to do it."[139] Therefore, notwithstanding his pretrial motion, appellant preserved his complaint about the trial court's jury selection procedure and he is not estopped from complaining now of the court's ruling on his 2014 request to follow Article 35.13.

---

[137] *Cf. Prystash*, 3 S.W.3d at 531.

[138] *See* TEX. R. APP. P. 33.1(a)(1); *see also Gillenwaters v. State*, 205 S.W.3d 534, 537–38 (Tex. Crim. App. 2006) (holding that the appellant's complaint was timely raised when his motion gave the trial court the opportunity to take corrective action "without burdening the parties and the judicial system with a costly appeal and retrial"; "gave the State a fair opportunity to respond"; and his delay in raising the claim "did not impair the orderly and effective presentation of the case to the jury") (internal citations omitted).

[139] *See* TEX. R. APP. P. 33.1(a)(2).

Nevertheless, appellant cannot prevail on the merits of his claim. Appellant avers that, only after the State exercises its challenges for cause *and* peremptory challenges to the venire member, should the defendant exercise his causal and peremptory challenges. He contends that, by requiring that the defense make its challenges for cause before the State exercised its peremptory challenges, the trial court unfairly provided advance notice to the State of how the defense would likely later exercise its peremptory strikes, thereby prejudicing his defense.

Appellant cites *Bigby v. State*[140] in support of his argument that the trial court erred in conducting jury selection in the above-described manner. This Court noted in *Bigby* that Article 35.20 regulates the manner of selecting a jury in a capital case in Texas.[141] Article 35.20 provides in relevant part:

> In selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant. Each juror shall be tried and passed upon separately.

Additionally, Article 35.13 provides:

> A juror in a capital case in which the [S]tate has made it known it will seek the death penalty, held to be qualified, shall be passed for acceptance or challenge first to the state and then to the defendant. Challenges to jurors are either peremptory or for cause.

In *Bigby*, this Court held that these two statutes read together provide that, in capital cases,

---

[140] *Bigby v. State*, 892 S.W.2d 864, 879–80 (Tex. Crim. App. 1994).

[141] *Id.* at 880.

jurors must be called individually.[142]  The Court also held:

> It seems apparent, [that] the legislature intended that defendant's challenges for cause could be made after the State has made its decision to accept a veniremember.  In this instance the statutory language evokes no other logical interpretation. . . .  Upon completion of voir dire by both parties of that potential juror, the State must choose to accept the veniremember or challenge him for cause or peremptorily, and then the defendant or his counsel may exercise its peremptory or causal challenge.[143]

In *Bigby*, over a defense objection, the trial court ruled that the State would have the opportunity to make its challenge for cause to each venire member, followed by the defendant's challenge for cause, followed by the State's peremptory challenge, and then the defendant's peremptory challenge.[144]  Relying on Articles 35.13 and 35.20, this Court found that the trial court "fell into error" by proceeding with voir dire in this manner.[145]  However, the Court concluded that the error was harmless under former TEX. R. APP. P. 81(b)(2).[146]

Six years later, the Court re-examined its decision in *Bigby*, noting that five members of this Court in a concurring opinion expressed their belief that the fairest and most objective

---

[142] *Id.*

[143] *Id.* at 879–80.

[144] *Id.* at 879.

[145] *Id*. at 880.

[146]  Former Rule 81(b)(2) applied the same harmless-error standard–that the appellate court must reverse the judgment unless the court determined beyond a reasonable doubt that the error did not contribute to the conviction or punishment–regardless of whether the error was of constitutional magnitude. *See Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011).  Under the current reversible error rule promulgated in 1997, that standard only applies to constitutional errors. *See* TEX. R. APP. P. 44.2(a).

interpretation of Article 35.13 provides trial judges the discretion during voir dire "to permit the exercise of challenges for cause by both sides before moving on to any use of peremptory challenges."  In other words, a trial court has the discretion to decide (1) whether the State must voice both a challenge for cause or a peremptory challenge before the defendant, or (2) that both sides issue any challenges for cause before the State first lodges a peremptory challenge. . . .  Either method, however, is acceptable under Article 35.13, and no error can result if either is followed.

Similarly, in *Wood v. State*,[147] this Court held that a trial court did not abuse its discretion by overruling an appellant's motion to require the State to exercise all of its strikes–both for cause and peremptory– before appellant's strikes, and did not abuse its discretion in "requiring that both sides issue challenges for cause prior to the State's use of a peremptory challenge."[148]

We conclude that the trial court's jury selection procedure in this case did not exceed the court's discretion.  We overrule appellant's twelfth point of error.

## CONSTITUTIONALITY OF DEATH PENALTY

In his final point of error, appellant asserts that "evolving standards of decency have reached the point where the [C]ourt can declare that the death penalty is no longer consistent

---

[147] *Wood v. State*, 18 S.W.3d 642 (Tex. Crim. App. 2000).

[148] *Id*. at 649.

with the values embodied in the Eighth Amendment." Appellant cites *Gregg v. Georgia*,[149] in which the United States Supreme Court stated that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[150]

Appellant provides no citation to authority or factual argument supporting his contention that "evolving standards of decency that mark the progress of America's maturing society" now render the death penalty per se unconstitutional. Further, *Gregg* does not support appellant's premise. The Supreme Court observed in *Gregg*, "[f]or nearly two centuries, this Court, repeatedly and often expressly, has recognized that capital punishment is not invalid per se."[151] The Court concluded that Georgia's statutory procedure did not violate the Eighth Amendment.[152] In addition, appellant's proposed holding conflicts with this Court's precedent.[153] Without more, we decline to overrule existing precedent. Appellant's thirteenth point of error is overruled. We affirm the judgment of the trial court.

DELIVERED:            June 20, 2018

DO NOT PUBLISH

---

[149] *Gregg v. Georgia*, 428 U.S. 153 (1976).

[150] *Id.* at 173.

[151] *Id.* at 177–78.

[152] *Id.* at 207.

[153] *See, e.g.*, *Castillo v. State*, 221 S.W.3d 689, 694 (Tex. Crim. App. 2007) ("The death penalty does not violate the Eighth Amendment."); *Threadgill v. State*, 146 S.W.3d 654, 672–73 (Tex. Crim. App. 2004) (same).